# BROWN *v.* STATE.

## (*Nashville.* February 20, 1890.)

1. GAMING. *"Book-making" on horse-races.*

"Book-making" on horse-races to be run on unlicensed tracks within the State, or on any tracks outside the State, is gaming.

Case cited: Edwards *v.* State, 8 Lea, 411.

2. SAME. *Example of "book-making."*

The facts stated in the opinion constitute what is called "book-making" on horse-races.

3. SAME. *Effect of privilege tax imposed upon "book-making."*

The privilege tax imposed by the revenue Act of 1889 upon "book-makers on horse-races" is a tax upon book-making on legal races run upon licensed tracks in the State; and cannot operate to license one who has paid the tax, to bet on races run outside the State, or upon unlicensed tracks within the State.

Act construed: Acts 1889, Ch. 130, p. 261.

---

FROM DAVIDSON.

---

Appeal from Criminal Court of Davidson County. G. S. RIDLEY, J.

QUARLES & TURLEY and HILL & GRANBERY for Brown.

Brown *v.* State.

Attorney-general PICKLE, E. E. BARTHEL, and
E. H. EAST for State.

FOLKES, J. Plaintiff in error was indicted and
convicted for gambling, in that he "did bet and
put at hazard upon a certain horse-race run upon
a track not authorized by the laws of Tennessee
money of the value," etc.

The case was tried, by consent, before the
Judge of the Criminal Court, without a jury, who
found the defendant guilty as charged, and im-
posed a fine of fifty dollars. Motion in arrest
and for new trial being made and overruled, the
defendant has appealed in error.

The record discloses the following facts: The
defendant had taken out a license under the Act
of 1889, Ch. 130, entitled "An Act to provide
revenue for the State of Tennessee and the coun-
ties thereof," wherein is imposed a tax, or privi-
lege license, in the following language: "Book-
makers on horse-races, each agent, firm, or person,
corporation, or firm in each county, each per
annum, or any shorter time, $25." That within
six months preceding the finding of the indictment
the defendant had acted as book-maker in making
bets on a horse-race to be, and that was thereafter,
run on a track outside of the State of Tennessee.

The transaction is thus described in the bill of
exceptions:

"There were four horses to be run in the race.
The defendant made, and offered at public outcry,

the following pools on each horse, to wit: $5 on a certain horse named that it would not win; this pool was bought by a by-stander for $5, making in this pool $10. $6.66⅔ for $3.33⅓ that another certain horse named would not win; this pool was bought by a by-stander for $3.33⅓, making in this pool $10. $7.50 for $2.50 that another certain named horse would not win; this pool was bought by a by-stander for $2.50, making in this pool $10. $8 for $2 that another certain named horse would not win; this pool was bought by a by-stander for $2, making $10 in this pool. On the succeeding day the race was run, and the party who had bought the pool on the winning horse was entitled to, and did receive from the defendant, the $10 in the pool purchased by him. The party only who purchased the pool on the winning horse was entitled to the money in his pool. If the horse lost, the seller of the pool, the defendant, would and did retain the entire pool, the money in each pool constituting the stake, the winner taking the whole stake or pool.

"This making, offering, and selling of the pools was all conducted in a place or room called a pool-room, where pools are sold on horse-races. The defendant kept books or memoranda of each bid made and accepted as hereinbefore stated."

The defendant had also taken out a license under the same Act of 1889, wherein, under the head of "Pool-selling," it is enacted that "each person, company, firm, or corporation, or agent en-

gaged in selling pools upon any running, trotting, or pacing race in this or any other State, each per annum, or shorter time, $500."

From the argument of counsel at the bar we are led to infer that the transaction shown in this cause is not now sought to be justified under the last-mentioned license.

If we are mistaken in this, it is sufficient to say that the defendant can find no refuge here, for the reasons fully given in the opinion of this Court in the case of Palmer & Cartwright, heard and disposed of at the same time with the case now under consideration, which will not be repeated here.

It is somewhat curious, however, that the transaction, as stated in that portion of the record which we have so largely quoted, should be spoken of so frequently therein as the "pools sold," when it is manifest that, stripped of needless verbiage, there was no selling of pools in the commonly accepted sense of the term.

It was in fact a public offer by the defendant, under the title of book-maker, to bet against each of the horses named for the race. Against one he offered to bet even money; against another, two for one; against another, three for one; and against another, four for one. Each bet was accepted by some one present, and the amount such person proposed to bet was handed to the book-maker, as stake-holder, until the race was run—he issuing a card showing amount, terms of bet, and

name of the horse. Whatever may have been the object in persistently speaking of thus "selling pools," it is finally admitted that the defendant was acting as a book-maker within the sense of the $25 license.

The main contention here on behalf of the defendant in the present case is that the transaction disclosed in this record is known as book-making, and is protected and made a privilege under the $25 license above herein quoted. It will be noticed that under the $500 tax as to pool-selling, it is extended in terms to races in this or in any other State, while in the book-making tax nothing is said as to where the race is to be run. The argument is that the latter tax, being without limit as to place of race, the Court should imply none, and that, having accepted the pecuniary consideration for such license, it would be in bad faith for the State to now insist on a limitation not contained in the license, nor in the Act authorizing it; that it is as competent for the State to legalize book-making on races run out of the State as in it.

Without elaboration, it is sufficient to say that if it were to be granted that the Legislature had such power, and could exercise it in a revenue bill, this Court would never assume that the Legislature had intended to grant such a privilege where the Act does not, in terms, so provide, and where it does not, by any fair implication, disclose such an intention.

At the time of the passage of this Act it was lawful to bet on a horse-race run upon a licensed track in this State, and, being so, the Legislature might well license the privilege of book-making (which is one of the most common forms of betting on a horse-race) as to races so run; while, under judicial decisions presumably known to the Legislature, it was unlawful to bet upon races to be run out of the State. *Edwards* v. *The State*, 8 Lea, 411.

In this condition of the law we must, in the effort to arrive at the intention of the Legislature, presume that it purposed, by the use of general language, to license a then legal, but not a then illegal, form of betting.

That book-making was intended to be confined to races to be run in this State, and upon licensed tracks in this State, would be the construction, therefore, that we would be compelled to place upon the book-maker's tax, if it stood alone upon the statute book.

But the question is placed beyond the region of debate when we find that in the very same Act the Legislature, when it comes to tax (but not license) pool-selling (merely another form of betting) on races to be run outside of the State, has said so in no ambiguous terms. *Expressio unius est exclusio alterius.*

Again, to extend the license to a race run out of the State would be, by implication, to repeal the criminal laws of the State, which construction is never given to a statute unless the repugnance

is clear and unavoidable; while to limit it, as we do, to races to be run in the State on a licensed track, avoids all repugnance and all conflict with or implied repeal of the law as it existed at the time of the passage of the Act in question.

We have not discussed the moral aspect of the subject, so much lauded on the one hand and condemned on the other in argument at the bar, for the reason that this phase of the question is one that addresses itself to the legislative and not to the judicial department of the government.

As individuals we may have and entertain views on this as on all questions affecting the welfare of the public, but as judges our duty ends in expounding the laws as they come from the hands of the Legislature, when they are not in conflict with the Constitution of the State.

Let the judgment be affirmed with costs.